540 So.2d 1083 (1989)
Jeanne Y. LEE and W. Chapman Lee, Individually and as Administrator of the Estate of Jeanne Elise Lee
v.
USAA CASUALTY INSURANCE COMPANY, Safeco Insurance Company of America, CNA Insurance Companies, Rolfe R. Schroeder, Individually and as Administrator of the Estate of Andrew E. Schroeder, and Country Corner Food Stores, Inc.
Robert H. WEAVER, Jr., Individually and as Administrator of the Estate of the Minor, Amelie Helene Weaver and Geraldine B. Weaver
v.
UNITED STATES AUTOMOBILE ASSOCIATION, Safeco Insurance Company of America, Continental Casualty Company, Rolfe R. Schroeder, Individually and as Administrator of the Estate of Andrew E. Schroeder, Country Corner Food Store, Inc. and State Farm Fire & Casualty Company.
Nos. CA 87 1388, CA 87 1389.
Court of Appeal of Louisiana, First Circuit.
February 28, 1989.
Writ Denied April 28, 1989.
*1084 James P. Doré and Allen Edwards, Plaquemine, for plaintiffs-appellees, Jeanne Y. Lee, et al.
Raymon G. Jones, New Orleans, for defendant-appellant, Continental Cas. Co.
Carolyn P. Perry, Robert Funderburk, Baton Rouge, for defendant-appellant, Safeco Ins. Co. of America.
Robert W. Smith and Boris F. Navratil, Baton Rouge, for defendants-appellants, Rolfe R. Schroeder, etc.
Philip Bohrer, Baton Rouge, for defendant-appellant, Country Corner Food Store, Inc.
James Zito, Baton Rouge, for defendant-appellee, City of Baton Rouge.
Dermot McGlinchey, Frederick Campbell, and Michael Guillory, New Orleans, for defendant-appellee, Continental Ins. Co. Louisiana State University.
Vincent Fornias, Baton Rouge, for plaintiff-appellee, Robert Weaver.
Before WATKINS, CRAIN and ALFORD, JJ.
ALFORD, Judge.
Jeanne Y. Lee and W. Chapman Lee (the Lees), individually and as administrators of the estate of their minor child, Jeanne Elise Lee (Jeanne Elise), commenced these proceedings on April 4, 1984, to recover damages for the injuries Jeanne Elise sustained as the result of an automobile accident which occurred on October 29, 1983.[1] The Lees named as the defendants:
(1) Rolfe R. Schroeder, individually and as administrator of the estate of his minor child,[2] Andrew Erickson Schroeder (Eric Schroeder), the underinsured *1085 driver of the automobile which collided with Jeanne Elise's vehicle;
(2) USAA Casualty Insurance Company of America (USAA), the liability insurer of Schroeder;
(3) Safeco Insurance Company of America (Safeco), the liability insurer of the Lees;
(4) Continental Casualty Company (CNA), the personal umbrella excess carrier of the Lees; and
(5) Country Corner Food Stores, Inc. (Country Corner), the convenience store which sold beer to the minor, Eric Schroeder.[3]
The facts surrounding this accident began shortly before noon on October 29, 1983. Seventeen-year-old Eric Schroeder received permission to drive his father's 1979 Oldsmobile Cutlass to a Sadie Hawkins Day school event at University High in Baton Rouge, Louisiana, where Eric was a senior. On the way to the event Eric picked up a classmate, James Bradley Aucoin (Bradley), to give him a ride. Eric then stopped at the Country Corner store and illegally purchased a six-pack of beer, drove to McDonald's near the LSU campus and purchased a couple of hamburgers and drove to the University High parking lot, arriving around 12:30 p.m. Eric and Bradley then visited in the car while Eric ate and drank all but one beer, which he gave away to a friend. After eating, Eric and Bradley participated in the Sadie Hawkins Day activities. At about 4:15 p.m. the senior class sponsor, Mrs. Gail Ater, asked Bradley to buy some more ice for the evening activities and she provided Bradley with money for the ice. Since Bradley did not have a car, he asked Eric to drive him to the Brown-Eagle Ice Company. Eric obliged and after picking up the ice, Eric and Bradley returned to the Country Corner where Eric illegally purchased another six-pack of beer. The accident with Jeanne Elise occurred on the way back to University High, on Dalrymple Drive.
Eric was driving approximately 40 m.p.h. (in a 30 m.p.h. zone) in a southerly direction on Dalrymple. Just before the intersection of Dalrymple and Washington Streets, Eric lost control of his vehicle, ran the right side of his car off the right side of the road and then suddenly pulled his automobile back onto the road where he shot across the center line into the northbound lane of traffic. Eric's vehicle crashed head on into sixteen-year-old Jeanne Elise's 1981 Datsun 510. Jeanne Elise was severely injured, narrowly escaping death due to the efforts of a bystander. Jeanne Elise sustained massive facial fractures and deep facial lacerations; part of her nose had been amputated; she lost 14 teeth; she had a sub-orbital "blow out" fracture of her left eye; she suffered a near complete amputation of her left index finger; she had a broken left wrist with severe lacerations, a broken collar bone, a broken first right rib and a deep laceration down to the kneecap on her left knee.
After two and one-half years, and fifteen operations performed on Jeanne Elise, the Lees' case went to trial on June 2, 1986. Subsequent to a trial by jury, a verdict was rendered finding substandard conduct on the part of Eric Schroeder and Country Corner[4] and assessing their fault at 68% and 32%, respectively. The jury determined the Lees had been damaged in the following amounts:

Jeanne Elise Lee
(a) Past physical pain and suffering $ 173,800

*1086
(b) Past mental anguish and emotional
distress $ 39,600
(c) Past medical, hospital, dental, psychiatric
and related expenses, including
travel 131,000
(d) Future physical pain and suffering 90,200
(e) Future mental anguish and emotional
distress 31,900
(f) Loss of physical and mental function
and disability 45,100
(g) Disfigurement and loss of capacity
for enjoyment of life 124,300
(h) Loss of future earnings and earning
capacity 706,200
(i) Future medical, hospital, dental, psychiatric
and related expenses, including
travel 104,500
 __________
 $1,446,600
W. Chapman Lee
Loss of love, companionship, affection,
society, comfort and solace $ 90,000
Jeanne Y. Lee
Loss of love, companionship, affection,
society, comfort and solace $ 90,000
 __________
TOTAL DAMAGES AWARDED $1,626,600

After a June 12, 1986, hearing regarding insurance coverage, the trial court rendered judgment (1) condemning USAA to pay a sum not to exceed the limits of its policy (determined to be $100,000) plus legal interest to the Lees; (2) condemning Safeco to pay a sum not to exceed the limits of its policy (determined to be $250,000) plus legal interest to the Lees; and (3) condemning CNA to pay a sum not to exceed the limits of its policy (determined to be $2,000,000) plus legal interest. CNA, Safeco and the Schroeders sought this appeal, raising numerous errors regarding uninsured motorist coverage, limits of liability and quantum. Each issue will be addressed separately, outlining each party's argument.

PROCEDURAL ISSUES
For the first assignment of error it is necessary to outline some procedural facts. On May 23, 1986, (a few days before trial) defendant, Schroeder, moved for leave of court to file a third party demand against LSU and its insurer, Continental Insurance Company (Continental), and for a continuance of trial. The trial judge denied the motion on May 29, 1986. Safeco and CNA also attempted to third party LSU and Continental during the trial; however, the trial judge denied both motions. On May 30, 1986, Safeco had LSU served with a subpoena duces tecum requesting that LSU bring the following documents to court on June 2, 1986:
All insurance policies (1) affording automobile liability coverage to Louisiana State University, its employees, staff, etc. and others; (2) all comprehensive general liability policies; and (3) all excess and umbrella policies, providing coverage on 10/29/83.
LSU and its insurer, Continental, filed a motion to quash the subpoena duces tecum on the grounds that the requested policies and information contained therein were irrelevant to the lawsuit and that the production of the requested documents would be prejudicial to LSU and Continental since neither was a party to the lawsuit nor represented at the trial which was underway. The trial judge granted the motion to quash the subpoena duces tecum. At that point, Safeco attempted to proffer Continental's insurance policies even though Safeco did not have possession of the policies. The trial judge refused the proffer. CNA and Safeco argue on appeal that the trial judge erred in quashing the subpoena duces tecum and in not allowing a proffer of Continental's policies. We disagree.
CNA and Safeco rely on Keller v. Amedeo, 512 So.2d 385 (La.1987), for the principle that their attempt to prove other insurance available for Schroeder under Continental's policy is "in reality a negative defense which seeks to refute an essential allegation of the plaintiff's petition." CNA and Safeco argue that it was error for the trial judge to disallow proof that Schroeder was not underinsured. We find of particular import the judge's reasons for quashing the subpoena duces tecum:
The Court notes that the subject subpoenas were issued in connection with Safeco's motion for leave to file a third party demand. The Court also notes that the said motion and all respective third party demands which have been filed since May 29, 1986, have been uniformly denied. The Court further notes that that date, May 29, 1986, is less than two working days prior to the date of this trial. The Court considered this to be a matter of extreme difficulty, number *1087 one, but also a matter of discretion and, accordingly, the Court grants the Motion to Quash. [Emphasis added.]
We do not understand why Safeco and CNA did not think of this "important negative defense" until two days before trial. The fact that LSU could have possibly been involved in some way was not hidden from CNA and Safeco. We agree with the Lees' argument that the trial judge has great discretion in this matter. La.Code Civ.P. art. 1354 states in pertinent part that "the court in which the action is pending in its discretion may vacate or modify the subpoena if it is unreasonable or oppressive." (Emphasis added.) Additionally, Louisiana jurisprudence recognizes the trial judge's discretion in quashing an unreasonable or oppressive subpoena. Thomas v. Weatherford International, 463 So.2d 751 (La.App. 4th Cir.1985); Bank of New Orleans and Trust Company v. Reed Printing & Custom Graphics, Ltd., 399 So.2d 1260 (La. App. 4th Cir.1981). We find that this subpoena duces tecum issued two days before trial to entities not even involved in the lawsuit was unreasonable. Therefore, we find that there was no abuse of discretion, and the ruling of the trial court was not in error.
As for the argument that the trial judge erroneously refused a proffer of Continental's policies by Safeco, we cannot agree. The Continental policies were not in the possession of Safeco (because the subpoena duces tecum had been quashed); therefore, Safeco had nothing to present for proffer. The trial court ruled correctly when it refused the proffer. The mandate of La.Code Civ.P. art. 1636[5] does not apply in this instance since Safeco had no evidence to offer for the court's consideration.

CNA'S UM COVERAGE
CNA next raises the argument that its personal umbrella excess policy does not provide UM coverage to the Lees. CNA relies on (1) an express exclusion in its policy, (2) Act 203 of the 1988 Legislative Session, and (3) the unconstitutionality of the UM statute (La.R.S. 22:1406) as applied to umbrella and excess policies.
We decline to consider CNA's contention that La.R.S. 22:1406 is unconstitutional. The constitutionality of a statute must be specially pleaded in the trial court. The record does not reveal that CNA advanced an assertion of unconstitutionality prior to the brief filed in this court. Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984).
CNA's assertion that its policy specifically excluded payment under UM coverage and that therefore CNA does not have UM exposure lacks merit. Automobile liability insurance issued in Louisiana must include uninsured motorist coverage unless it has been rejected by the insured. La.R.S. 22:1406(D)(1)(a). The principal elements of uninsured motorist coverage are prescribed by law. La.R.S. 22:1406(D). Any clause in an insurance contract in derogation of the mandatory requirements set forth in the statute is invalid insofar as it conflicts with law. Bond v. Commercial Union Assurance Company, 407 So.2d 401 (La.1981). The clause in CNA's policy[6] which attempts to exclude UM coverage is invalid because it directly conflicts with Louisiana's UM statute. CNA's policy lists as a "Condition" that "if this policy conflicts with state or local laws, then it is changed to conform with the laws." Therefore, we find that CNA's policy, itself, recognizes that an exclusion contrary to state law would be invalid. Accordingly, we conclude that the UM exclusion in CNA's umbrella policy is violative of Louisiana's UM statute and is unenforceable.
*1088 CNA strongly urges that Louisiana's UM statute does not apply to excess and umbrella policies. However, this contention ignores the express holding of our Supreme Court in Southern American Insurance Company v. Dobson, 441 So.2d 1185 (La.1983), on rehearing, that the mandatory directive of La.R.S. 22:1406(D)(1)(a) must be read into the terms of umbrella and excess policies which apply to liability "arising out of the ownership, maintenance or use of a motor vehicle,[7]" absent a written waiver by the insured. There is no such written waiver in this case. Therefore, the provisions of the statute apply.
By way of supplemental brief CNA argues that the Legislature overruled Dobson, supra, and its progeny by enacting Act 203 in the 1988 Legislative Session. Act 203 amends and reenacts La.R.S. 22:1406(D)(1). CNA specifically points to a new section (D)(1)(e) which reads as follows:
(e) The uninsured motorist coverage does not apply to bodily injury, sickness, or disease, including death of an insured resulting therefrom, while occupying a motor vehicle owned by the insured if such motor vehicle is not described in the policy under which a claim is made, or is not a newly acquired or replacement motor vehicle covered under the terms of the policy.
CNA contends that this language is a "clarification" of existing law and that it merely interprets the existing law. Therefore, CNA argues this new language clearly restricts the application of the UM statute to excess and umbrella policies and this new language is retroactive.
Regardless of what this new section (e) of La.R.S. 22:1406(D)(1) means,[8] we disagree that it is to be applied retroactively. CNA failed to read "Section 2" of Act 203 which states: "This Act shall apply to policies issued or renewed with effective dates on or after the effective date of this Act [Sept. 9, 1988]." (Emphasis added.) Since CNA's policy was issued to the Lees on June 24, 1983, for the policy period of July 1, 1983, through July 1, 1986, Act 203 clearly does not apply in this case. Therefore, following the Dobson rule, we find that CNA's personal umbrella excess policy did provide UM coverage in this case.

LIMITS OF LIABILITY
Mr. Lee, the insured owner of the car in which Jeanne Lee was injured, had two insurance policies that afforded coverage both on this vehicle (the 1981 Datsun 510) and upon another vehicle (a 1983 Chevrolet Custom Van): (1) a liability policy (issued *1089 by Safeco), which provided $250,000 liability insurance for the insured's negligence, and which also contained $250,000 uninsured motorist insurance; and (2) a personal umbrella excess liability policy (issued by CNA) that provided for $1,000,000 liability coverage for the insured's negligence on each of the vehicles, in excess of the coverage provided by Safeco. As stated above in the section on CNA's UM coverage, under Louisiana's uninsured motorist statute, the CNA umbrella policy also provided $1,000,000 uninsured motorist coverage on each of Lee's vehicles.
Based on the above outlined insurance policies, the coverages that were potentially available for the trial judge to choose from to pay liability for damages caused by the negligence of the tortfeasor (Schroeder), the underinsured motorist, are:
1. The $100,000 liability coverage (USAA) on the operation of Schroeder's car;
2. The $250,000 UM coverage (Safeco) issued to the insured (Lee) on the vehicle in which Jeanne Elise was driving when injuredconsidered "primary" UM coverage on the vehicle;
3. The $250,000 UM coverage (Safeco) provided by the same policy on the other vehicle of the insured (i.e., the van in which Jeanne Elise was not occupying at the time of the accident) considered "excess" UM coverage;
4. The $1,000,000 UM coverage; statutorily provided to the insured (Lee) by CNA as the result of its issuance of its umbrella coverage on the vehicle in which Jeanne Elise was drivinghow to classify this UM coverage is the important issue before us;
5. The $1,000,000 UM coverage provided to the insured (Lee) by CNA as the result of its umbrella coverage of Lee's other vehicle (the van) insured by the policysince Jeanne Elise was not occupying the van at the time of the accident, this would be considered "excess" UM coverage.
The jury awarded the plaintiffs a total amount of $1,626,600. The trial judge held the insurers liable for the following amounts: (1) USAA, as liability insurer of Schroeder, for its policy limits of $100,000 not contested on appeal; (2) Safeco, as a "primary" UM insurer of the vehicle in which Jeanne Elise was driving when injured, for its UM policy limits of $250,000; (3) CNA, under its statutory "primary" UM coverage of the vehicle in which Jeanne Elise was driving when injured, in the amount of $1,000,000; and (4) an additional $1,000,000 from CNA under its "excess" UM coverage of the non-accident vehicle (the van) of the insured (Lee). Essentially, the trial judge found that Jeanne Elise was an injured occupant of a non-owned vehicle, so she fell into the statutory exception to the anti-stacking limitation[9]. Since the tortfeasor's and the primary UM coverages were exhausted without satisfying the judgment, the trial judge allowed the Lees to "stack" one "excess" UM coverage in addition to damages covered by Schroeder's own (USAA) liability policy and any "primary" UM coverage issued on the vehicle in which Jeanne Elise was occupying. Out of the two potentially available "excess" UM coverages (Safeco's $250,000 or CNA's $1,000,000) the Lees elected the policy with the highest limits (i.e., CNA's policy).[10] The trial judge based his ruling on *1090 prior, rather complex, jurisprudence regarding "stacking" of UM coverages.[11]
CNA appeals the trial court's "doubling" of its total protection provided under the umbrella policy to $2,000,000. CNA argues that the trial judge's additional $1,000,000 award, which made CNA liable for a total of up to $2,000,000, ignores the aggregate and per occurrence liability limitations[12] stated in Item 3 of the personal umbrella excess policy at issue in this case.
This very same issue was raised and decided in a very persuasive decision, Jasmin v. Dumas, 769 F.2d 1047 (1985), rev'd on rehearing, 781 F.2d 1161 (5th Cir. 1986).[13] The Fifth Circuit Court of Appeals for the United States, interpreting Louisiana law, held that because the umbrella policy provided an aggregate and per occurrence liability limit of $1,000,000 on both vehicles together, once UM coverage was exhausted on one vehicle, there was no more umbrella remaining or available on the other vehicle. We agree with this view. Liability limits in an umbrella policy should be respected. Jasmin, 781 F.2d at 1165, citing Capone v. King, 467 So.2d 574 (La.App. 5th Cir.), cert. denied, 468 So.2d 1205 (La.1985).
CNA's umbrella liability coverage limit of $1,000,000 per accident means that only $1,000,000 (not $2,000,000) of UM coverage was provided by the policy, insofar as any one accident was concerned. Once the $1,000,000 UM coverage was exhausted on the accident vehicle in order to cover Schroeder's liability, no more umbrella UM coverage remained to cover the other vehicle (i.e., the van). The additional $1,000,000 of "excess" UM coverage on the other vehicle, awarded by the trial judge, did not exist and could not be stacked as excess coverage. See Jasmin, 781 F.2d at 1165. The portion of the trial court's judgment finding this additional $1,000,000 coverage by CNA must, therefore, be vacated.
Notwithstanding the deletion of the additional $1,000,000 for which CNA was held liable, Jeanne Elise still falls into the statutory exception to the anti-stacking limitation (La.R.S. 22:1406(D)(1)(c)). This means that the Lees are entitled to "stack" the remaining "excess" UM coverage of $250,000 provided by Safeco on the other vehicle (the van) owned by the insured (Lee).
Based on the foregoing, we vacate that portion of the trial court's judgment outlining insurance coverage and amend it to hold the insurers liable for the following amounts:
1. USAA, as liability insurer of Schroeder, for its policy limits of $100,000;
2. Safeco, as "primary" UM insurer of the vehicle which Jeanne Elise was occupying at the time of the accident, for its UM policy limits of $250,000;
3. CNA, as statutory "primary" UM insurer of the vehicle in which Jeanne Elise was occupying at the time of the accident, for its aggregate limit of $1,000,000; and
4. Safeco, as "excess" UM insurer of the other vehicle (the van listed in the same policy) in which Jeanne Elise was not occupying at the time of the accident, for its UM limits of $250,000. (This puts Safeco's total liability at $500,000 for this accident.)[14] *1091 Each insurer is, of course, also liable for legal interest on its stated limits from date of judicial demand until paid.

QUANTUM
Of all the damage awards in this case, defendants (CNA and Schroeder) challenge only the $706,200 award to Jeanne Elise for "loss of future earnings and earning capacity" and the $90,000 awards to each of Jeanne Elise's parents for "loss of love, companionship, affection, society, comfort and solace."
Before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion in making the award. An award made in the trial court may not be modified unless it is unsupported by the record. The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971); Black v. Ebasco Services, Inc., 411 So.2d 1159 (La.App. 1st Cir.), writ denied, 414 So.2d 1253 (La.1982); Greene v. Wright, 365 So.2d 551 (La.App. 1st Cir. 1978). Moreover, the appellate function in reviewing quantum is limited to raising inadequate awards to the lowest amount the trial court could have reasonably awarded, and lowering excessive awards to the highest amount the trial court could have reasonably awarded. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, supra; Alexander v. Leger, 423 So.2d 731 (La.App. 3d Cir.1982), writ denied, 430 So.2d 75 (La.1983); Greene v. Wright, supra. In the final analysis, the damages due in a given case must reflect the facts and circumstances of that case. Alexander v. Leger, supra; Wilkinson v. Hartford Accident & Indemnity Co., 421 So.2d 440 (La.App. 3d Cir.1982); Profit v. Linn, 346 So.2d 253 (La.App. 1st Cir.1977).
Loss of Future Earnings and Earning Capacity
In Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir.1984), the Second Circuit provided an excellent summary of the law regarding lost future income:
Awards for loss of future income are inherently speculative, and are intrinsically insusceptible of being calculated with mathematical certainty. Thus, the courts must exercise sound judicial discretion in determining these awards, and render awards which are consistent with the record and which work an injustice on neither party.
A number of factors must be analyzed in determining loss of future income, including the plaintiff's physical condition before and after his injury; his past work record and the consistency thereof; the amount plaintiff probably would have earned absent the injury complained of; and the probability he would have continued to earn wages over the balance of his working life. It is well established that a loss of future income award is not merely predicated upon the difference between a plaintiff's earnings before and after a disability injury. Such an award is predicated, more strictly considered, upon the difference between a plaintiff's earning capacity before and after a disabling injury. Loss of future income awards thus encompass the loss of plaintiff's earning potential the loss or reduction of a persons' [sic] capability to do that for which he is equipped by nature, training, and experience, and for which he may receive recompense. [Citations omitted; emphasis original.]
Jeanne Elise was a 16 year old junior honor student in high school when the accident occurred. She was beautiful, outgoing, and cheerful; she also made friends easily. She participated in many extracurricular activities at school such as cheerleading and sports. She was well thought of by her friends and teachers. Jeanne Elise made excellent grades in high school without putting forth much effort and she planned to attend college after completion of high school. Since Jeanne Elise enjoyed and excelled in math she had thought of *1092 planning a career as a financial consultant or banker.
After the accident Jeanne Elise suffered a 34 point drop in her IQ level. Before the accident she ranked in the 80th percentile on nationally standardized college entrance exams; after the accident she ranked in the 40th percentile. Jeanne Elise also suffers from a permanent learning and short-term memory problem. Studying, and then comprehending what she has studied, takes great effort for her now. Since Jeanne Elise has had difficulty dealing with her extensive facial injuries and limitations she tends to deny that anything is different now. She is unrealistic about her capabilities; for instance, she still believes she could have a career in finance notwithstanding the fact that after the accident math is her worst subject. Jeanne Elise has undergone a severe personality change and she now lacks judgment-making abilities. She suffers from irrational, impulsive behavior and is not aware of her changing environment. Although Jeanne Elise was in college at the time of trial, her grades were very bad and it is very unlikely that she can successfully finish college.[15]
An expert in vocational and rehabilitative counseling, Ms. Stephanie Chalfin, testified that due to Jeanne Elise's emotional and neurological deficits her vocational opportunities were very limited now. Ms. Chalfin stated that Jeanne Elise would only be able to work in a very structured, non-stressful work environment, doing repetitive, simple things not requiring decision making or judgment-solving skills. Ms. Chalfin's testimony was not rebutted.
In short, before the accident Jeanne Elise had a very bright, unlimited choice of future occupations; however, after her injury, Jeanne Elise is limited to a menial type, entry-level job.
The Lees' expert economist, Dr. G. Randolph Rice, calculated Jeanne Elise's loss of future wages, and his testimony on this matter was unrefuted. He stated that Jeanne Elise had a work-life expectancy of 30.78 years if she could have finished college. Dr. Rice testified that college graduates with degrees in math-related fields earn from $18,000$35,000 per year. Projected over a 30.78-year work life with a 7.5% discount rate, Dr. Rice testified that the range of future lost wages for a mathrelated career was $554,040 to $1,077,300.
The jury awarded Jeanne Elise $706,200 for lost future earnings and earning capacity. This award was well within the range testified to by the only witness on this issue. We find that the jury's reliance on Dr. Rice's calculations was not an abuse of discretion. No alternative means for calculating loss of future earnings was presented by the evidence, and Dr. Rice made reasonable calculations despite the complexity of determining Jeanne Elise's projected wages. Jeanne Elise should not be deprived of an award of lost future earnings simply because she had never been employed before her injury. Our Supreme Court in Folse v. Fakouri, 371 So.2d 1120 (La.1979), recognized that damages for loss of future earnings or loss of future earning capacity should be based upon the injured person's ability to earn rather than upon what she actually earned prior to the injury. The Folse court stated damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that she may never have seen fit to take advantage of that capacity. The theory is that the injury has deprived her of a capacity she would have been entitled to enjoy even though she never profited from it monetarily. Folse, supra.
We find substantial evidence in the record to support the loss of future earnings and earning capacity award and we find no abuse of discretion by the jury in making this award.
Loss of Consortium
Defendants argue that under Worsham v. Walker, 498 So.2d 260 (La. App. 1st Cir.1986), writ denied, 500 So.2d 423 (La.1987), loss of consortium in the *1093 parent-child context means "loss of the aid, assistance and companionship of the child."[16] In Worsham we did not find that the parents' relationship with their child had been damaged. On the contrary, in the case sub judice we see abundant evidence of a damaged parent-child relationship. Other elements of loss of consortium are loss of affection, society and service. We agree with the jury's finding that Mr. and Mrs. Lee are entitled to a loss of consortium award.
Jeanne Elise's parents testified regarding the radical change in their daughter's personality. Before the accident she got along very well with her family, was independent and helpful around the house. After the accident she didn't communicate well or get along with her family. She was unable to help around the house. She was angry, moody and argumentative. Mr. Lee stated that Jeanne Elise "hurt the very people that love her." Under these facts Mr. and Mrs. Lee sustained a definite loss of affection, aid and assistance. Before the accident Mrs. Lee testified that she and Jeanne Elise enjoyed being together and doing ordinary things that mothers and daughters do. However, after the accident nothing was the same. Jeanne Elise was resentful and took her anxieties out on her mother. We find that there was sufficient evidence of loss of affection and companionship in this parent-child relationship.
The jury awarded $90,000 to each of Jeanne Elise's parents for loss of consortium. Since consortium cannot be calculated with certainty, the trier of fact has great discretion in making the award.[17] However, we believe that an award of $90,000 to each parent in this case is excessive and was an abuse of discretion on the jury's part. Undoubtedly Mr. and Mrs. Lee suffered considerable mental anguish over the accident; however, it is well-settled that a person may not recover for the mental anguish which he suffered as a result of the injury to another person. 498 So.2d at 266. Without the aid of other cases with similar factual circumstances, we find that the record supports an award of $30,000 to each of Jeanne Elise's parents for loss of consortium. We therefore vacate that portion of the trial court's judgment awarding a total of $180,000 to Mr. and Mrs. Lee for loss of love, companionship, affection, society, comfort and solace, and amend that award to be a total of $60,000 (or $30,000 each).

CONCLUSION
For the above and foregoing reasons we amend the trial court's judgment in the following manner:
(1) That portion of the judgment which condemned CNA to pay up to a total of $2,000,000 is hereby vacated and amended to be up to a total of $1,000,000, plus legal interest from the date of judicial demand;
(2) That portion of the judgment which condemned Safeco to pay up to a total of $250,000 is hereby vacated and amended to be up to a total of $500,000, plus legal interest from the date of judicial demand; and
(3) That portion of the judgment awarding Mr. W. Chapman Lee and Mrs. Jeanne Y. Lee $90,000 each for loss of love, companionship, affection, society, comfort and solace is hereby vacated and amended to be $30,000 each.
In all other respects the judgment of the trial court is affirmed. Costs of this appeal are to be shared equally by defendants-appellants, CNA, Safeco and Schroeder.
AFFIRMED IN PART, VACATED AND AMENDED IN PART AND RENDERED.
NOTES
[1] These proceedings were consolidated for trial purposes with a suit entitled "Robert H. Weaver, Jr., et al. versus United States Automobile Association, et al." on March 4, 1985. The issues involved in the Weaver case are not before us on appeal.
[2] At the time of trial, June 2, 1986, both Jeanne Elise and Eric Schroeder had reached the age of majority.
[3] On September 10, 1984, the Lees filed a First Supplemental and Amending Petition naming as an additional defendant, State Farm Insurance Company (State Farm), the public liability insurer of Country Corner. Thereafter, on October 29, 1984, the Lees filed a Second Supplemental and Amending Petition naming as additional defendants, the State of Louisiana, City of Baton Rouge and the Parish of East Baton Rouge, the owner and custodians of Dalrymple Drive where the accident occurred. State Farm and the State of Louisiana were dismissed on summary judgment prior to trial. A directed verdict was granted at trial in favor of the City and Parish, thereby dismissing all claims against those entities. The summary judgments and directed verdicts are not before us on appeal.
[4] On April 29, 1988, we received a "Notice of Automatic Stay" regarding Country Corner because it had filed for relief under Title 11 in the United States Bankruptcy Court for the Middle District of Louisiana (Case No. 88-00545)
[5] La.Code Civ.P. art. 1636 provides in pertinent part: "When a court rules against the admissibility of any evidence, emphasis ... it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence." (Emphasis added.)
[6] CNA's policy provides under the Exclusions and Restrictions section:

We do not provide coverage for:
. . . .
8. No-Fault, Uninsured, or Underinsured Motorists benefits to you or anyone else entitled to coverage under this policy.
[7] CNA's policy clearly applies to liability arising out of the ownership, maintenance or use of a motor vehicle. On the declaration page under the Schedule of Required Basic Policies and Type of Coverage sections, it lists under the heading Motor Vehicle Liability coverage for motor vehicles owned, leased or furnished for regular use by any covered person. Under the Definitions section, the policy reflects:

1. Covered person means:
a. you and your relatives who live with you.
b. anyone under 21 who is in your care and/or in the care of your relatives who live with you.
c. anyone using your motor vehicles or equipment with your permission who is covered under one of your basic policies....
. . . .
2. Injury means bodily injury or mental harm to others caused by an accident.
. . . .
7. Motor Vehiclea motorized land vehicle designed for travel on public roads or subject to motor vehicle registration. [Emphasis original.]
Under the Coverages section of the policy it reads:
This policy provides extra liability insurance over and above what is covered by your basic policies....
1. We will pay, up to the limit of coverage shown on the Declarations, the amount you are or would be obligated to pay if you were at fault or held to be at fault in court.... [Emphasis original.]
Under Conditions it states:
1. Limit of Coverage and Loss Settlement
a. When you have a loss which is covered by a basic policy, your basic policy(ies) provides coverage first; and then this policy adds to the basic policies:
Basic policy limits $100,000
This policy's limits $1,000,000
Total protection $1,100,000
(Emphasis original.) The basic policy in this case was provided by Safeco with a liability limit of $250,000.
[8] We do not attempt to interpret the meaning of La.R.S. 22:1406(D)(1)(e) in this case.
[9] In pertinent part, La.R.S. 22:1406(D)(1)(c) (1977), provides:

With respect to bodily injury to an injured party while occupying an automobile not owned by said injured party, the following priorities of recovery under uninsured motorist coverage shall apply:
(i) The uninsured motorist coverage on the vehicle in which the injured party was an occupant is primary;
(ii) Should that primary uninsured motorist coverage be exhausted due to the extent of damages, then the injured occupant may recover as excess from other uninsured motorist coverage available to him. In no instance shall more than one coverage from more than one uninsured motorist policy be available as excess over and above the primary coverage available to the injured occupant. [Emphasis added.]
[10] The plaintiff is entitled to elect to recover from, of several "excess" UM insurers, the "provision or policy with the highest limits." Taylor v. Tanner, 442 So.2d 435 (La.1983).
[11] See Courville v. State Farm Mutual Automobile Insurance Company, 393 So.2d 703 (La. 1981); Bonner v. Robinson, 415 So.2d 527 (La. App. 1st Cir.1982); and Capone v. King, 467 So.2d 574 (La.App. 5th Cir.), cert. denied, 468 So.2d 1205 (La.1985).
[12] The Conditions section of CNA's policy reads in pertinent part, as follows:

c. Coverage for any one accident is limited to the maximum limit shown in Item 3 of the declarations.
Item 3 of the Declarations reads as follows:
"3. Limit of Coverage $1,000,000 Each Accident."
[13] In Jasmin, supra, the insurance policy involved was a commercial umbrella policy covering two vehicles instead of a personal umbrella policy. For the purposes of our holding in this case we do not consider this to be a distinguishing factor which would render Jasmin inapplicable.
[14] Safeco's policy specifically states that UM coverage is provided for bodily injury up to "$500,000 each accident."
[15] All of these facts were testified to by various experts in guidance counseling, neuro-psychology and vocational and rehabilitative counseling.
[16] La.Civ.Code arts. 2315 and 2315.2 give parents a cause of action for loss of consortium when their child is injured by the fault of another.
[17] Schwamb v. Delta Air Lines, Inc., 516 So.2d 452 (La.App. 1st Cir.1987), writ denied, 520 So. 2d 750 (La.1988).